**STATE of Missouri, Respondent,**

v.

**Vernon GOLATT, Appellant.**

**No. WD 59828.**

Missouri Court of Appeals,
Western District.

May 28, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

Application for Transfer Denied
Aug. 27, 2002.

Roderick E. Smith, John M. Schilmoeller, Co-Counsel, Kansas City, for appellant.

Dora A. Flichter, Asst. Attorney General, Jefferson City, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, EDWIN H. SMITH, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Judge.

Vernon Golatt appeals his convictions in the Circuit Court of Jackson County of murder in the first degree, § 565.020.2,[1] and armed criminal action, § 571.015. Appellant was sentenced to life imprisonment without the possibility of probation or parole on the murder count and ten years imprisonment on the armed criminal action count.

On the evening of August 26, 1996, Appellant and Eric Wright went to visit Janice Jones at her apartment at 619 East Armor in Kansas City, Missouri. Prior to leaving the apartment, Appellant asked to borrow a knife from Jones, claiming that he needed it to do some work on his car. Appellant took a short paring knife from Jones' dish rack. As he was leaving,

---

1. All statutory references are to RSMo 1994 unless otherwise noted.

Jones noticed that Appellant also had another knife in his pocket.

Appellant and Wright then went to the apartment of David Smith at 701 East Armor. Marlon Moseby and several other individuals were at the apartment. Moseby and another man were packaging "dope." Appellant and Wright purchased some crack cocaine from Moseby and proceeded to "get high" with the others at the apartment.

After about fifteen to twenty minutes, Wright left the apartment. As Wright was going down a stairwell, he heard Appellant calling to him. Appellant told Wright that he wanted to talk to him. When Wright refused to talk with Appellant, Appellant grabbed Wright and started hitting him. Appellant knocked Wright down in a corner of the stairwell near the door to the lobby, pulled out a knife, held it to Wright's neck, and ordered Wright to stay there. Appellant told Wright that he was going to get some more dope from Moseby and went back to Smith's apartment.

Shortly thereafter, Appellant returned to the stairwell with Moseby. As Appellant and Moseby reached the landing in the stairwell above where Wright was waiting, Appellant grabbed Moseby from behind and placed his hand over his mouth. Appellant pushed Moseby down the stairs until they reached the bottom of that flight and ran into the door to the lobby. Appellant then tried to pull Moseby down the stairs toward the basement, but Moseby grabbed the railing. When Appellant managed to pull Moseby away from the railing, they both fell backward down the stairs to the basement. Once they reached the bottom of the stairs, Appellant and Moseby began to wrestle. Appellant managed to open the boiler room door and to pull Moseby into the boiler room. He then took out a knife and began

stabbing Moseby multiple times. While stabbing Moseby, Appellant told him to "stay still." As this was going on, Wright came down the stairs to see what was happening. Once Moseby was still, Appellant went through his pockets.

After seeing this, Wright said, "Man, I'm getting out of here," and turned to leave. As he was going up the stairs, Appellant grabbed him by the shoulder. Appellant asked, "Where's the dope?" Wright responded that he did not know. Appellant told Wright that he would not be able to leave through the front door because of the blood on his clothes. Wright told Appellant that he did not care where he went, and Wright then left through the lobby and out the front door.

As Wright began walking back toward Jones' apartment, he heard the alarm go off at the side door of Smith's apartment building and saw Appellant running away from the building. Wright then continued to walk back to Jones' apartment. When he arrived at the apartment building, Wright heard Appellant call out his name from an alley on the side of the building. Wright went over to Appellant to see what he wanted. Appellant told Wright to open up the back door for him. Wright then went through the front door of the building and went to the back of the building to open the door for Appellant.

Appellant and Wright then went up to Jones' apartment. When Jones opened the door, Appellant walked straight into the bathroom and began to wash the blood off. Wright spoke with Jones to try to calm her down, and once she was calmed, Wright and Jones got high.

When Appellant finished washing the blood off his body, he came out of the bathroom and asked Jones for a change of clothes. Jones told him that she did not have any clothes in the apartment that

would fit him. Disregarding Jones' comment, Appellant went through her clothes hamper and selected some clothes to put on. After he dressed, Appellant came out of the bathroom, sat down at the table with Wright and Jones, put two rocks of crack cocaine on the table, and started to get high. Appellant then took out Moseby's wallet, examined the contents, and removed the cash inside. He gave some of the money to Wright and pocketed the rest.

After a while, Wright got up and left the apartment. As he was leaving, Appellant caught up with him at the building exit and told Wright to keep his mouth shut.

In the early morning hours of August 27, 1996, Smith found Moseby's dead body in the boiler room. He then called the police, who arrived at about 1:30 a.m.

An autopsy performed on Moseby's body revealed two stab wounds on the right side of his back. One of the stab wounds had fractured a rib and punctured his right lung, and the other wound punctured both his right lung and liver. The internal bleeding caused by these wounds caused Moseby's death.

On December 9, 1996, Appellant was charged by indictment with first degree murder and armed criminal action related to Moseby's death along with the second-degree murder of another individual twelve days earlier. On August 10, 1998, Appellant filed a motion to sever those counts because the crimes were unrelated. On January 7, 2000, a new indictment was issued, and Appellant was charged by indictment with murder in the first degree and armed criminal action for the death of Moseby.

Prior to Appellant's trial, Wright entered into a plea agreement with the State. As part of that agreement, Wright agreed to plead guilty to murder in the second degree and armed criminal action and to cooperate fully and truthfully in Appellant's trial. In exchange for his plea and cooperation in Appellant's trial, the State agreed to recommend sentences of fifteen years on the murder count and ten years on the armed criminal action count. Wright's plea was subsequently entered, and he was sentenced in accordance with the State's recommendation.

Trial in Appellant's case lasted from October 16 through October 20, 2000. At the close of evidence, the State asked to "prove the defendant up." At that point, the State realized that it had failed to file an information in lieu of indictment charging Appellant as a prior offender and asked for leave to file an amended information charging Appellant as a prior offender. The trial court granted leave to file the information over Appellant's objection.

Subsequently, the jury found Appellant guilty of murder in the first degree and armed criminal action. On January 22, 2001, the trial court sentenced Appellant to life imprisonment without the possibility of parole on the murder count and ten years imprisonment on the armed criminal action count. Appellant brings two points on appeal.

In his first point, Appellant claims that the trial court abused its discretion during *voir dire* of the venire panel in allowing the State to call Wright a "cooperative witness," to refer to Wright as a codefendant who had pleaded guilty to the same crime, and to inform the jury that the State had entered into a plea agreement with Wright in exchange for his "truthful testimony" in Appellant's case. Appellant also contends that the trial court committed plain error in allowing the State to elicit testimony related to the agreement to provide truthful testimony during direct and re-direct examination of Wright and to

mention the agreement to provide truthful testimony during closing argument. Appellant contends that all of the aforementioned acts by the State constituted improper vouching for Wright's testimony and warrant reversal of Appellant's convictions.

■ We first address Appellant's contentions related to *voir dire.* During the course of *voir dire,* the prosecution made several rather inarticulate attempts to ask the "snitch" question.[2] In one attempt, the State referred to Wright as a "co-defendant." In another, Wright was described as a "cooperative witness." And the State also remarked that Wright "was involved in the case, he pled guilty in exchange for his truthful testimony in the case." Appellant's counsel did not expressly object to use of any of the terms or phrases about which Appellant now complains, although he did generally object to the inartful *voir dire* and attempted in bench conferences to preclude further questions and answers. It must be noted, however, that the State made only a single reference to Wright being a "co-defendant" or "cooperative witness," and likewise referred to the agreement to provide "truthful testimony" only once during *voir dire.*

■ "The control of *voir dire* is a matter within the sound discretion of the trial court." *State v. Dudley,* 51 S.W.3d 44, 54 (Mo.App. W.D.2001). "Rulings on *voir dire* questions will not be disturbed absent a showing of abuse of the trial court's discretion." *State v. Johnson,* 968 S.W.2d 686, 691 (Mo. banc 1998).

■ "Vouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's wit-

ness that are not before the jury for their consideration." *State v. Ringo,* 30 S.W.3d 811, 822 (Mo. banc 2000). But "[i]n *voir dire,* '[t]he state is entitled to elicit from prospective jurors any preconceived notions that they might have concerning the law and to ask specifically whether they would refuse to consider the testimony of State witnesses with the benefit of a plea agreement.'" *Dudley,* 51 S.W.3d at 54 (quoting *Johnson,* 968 S.W.2d at 691). "Such *voir dire* questions are allowed as being relevant because, any time the State enters into a plea agreement with a witness, the issues of bias and self-interest arise, since plea agreements are 'double-edged swords' ... that 'not only support [][a] witness' credibility by showing an interest to testify truthfully, but also impeach[][a] witness' credibility by showing an interest in testifying favorably for the government, regardless of the truth.'" *Id.* (citations omitted).

The record sufficiently supports a determination by the trial court that the State was asking its questions for the purpose of ascertaining whether any of the venire members would refuse to consider the testimony of a witness who had been granted a plea agreement. Since Wright was going to give eyewitness testimony concerning Appellant's actions before, during, and after Moseby's death, "the State had the right to discern any prejudice on the panel against testimony procured by the terms of a plea agreement." *Johnson,* 968 S.W.2d at 691.

While the prosecution's inability to articulate its question clearly, repeated objections from the defense, and questions from venire members caused the question to be restated and reworded several times, the

---

2. Essentially, whether any members of the panel would automatically refuse to believe a witness who had cut a deal with the state in exchange for his agreement to testify in the case.

trial court had an opportunity to view the demeanor of both the prosecutor and the venire panel and to assess any prejudicial impact that might have resulted from the State's questions. The trial court could reasonably have determined that the State did not have any motive aside from attempting to discover potential bias against a witness that had pled guilty.

Moreover, considering the *voir dire* as a whole, it does not appear that the State's comments would have conveyed to the jury that the State had additional facts beyond those that would be presented at trial regarding the veracity of the witness's testimony. The State only referred to the agreement to provide "truthful testimony" once during *voir dire*, and its single reference to the witness being a "cooperative witness" does not imply anything more than the fact that he was a involved in the offense but was testifying on behalf of the State. "Contrary to defendant's claim, [these] remark[s] did not suggest the prosecutor believed [the witness's] testimony or knew whether it was accurate or not." *Ringo*, 30 S.W.3d at 823.

The existence of [the witness's] plea bargain presented a potential credibility problem for him as a witness. The state, recognizing that fact and anticipating the defense's inevitable attempt to impeach him, decided as a matter of trial strategy to reveal the existence of the agreement, which was for truthful testimony. Neither error nor vouching is evident.

*Id.*

■ Finally, further belying Appellant's claim of vouching, the State ultimately referred to Wright as a "snitch" and as having "cut a deal," terms that may have diminished his credibility and minimized any prejudicial impact that might have resulted. The State also told the venire panel that it would be up to them as jurors to evaluate the witness's credibility. Accordingly, viewing the record in the light most favorable to the trial court's ruling, we cannot find any abuse of discretion in the trial court's decisions during *voir dire*.[3] *See Dudley*, 51 S.W.3d at 54.

■ Appellant's remaining claims of error in his first point have not been properly preserved for review,[4] and Appellant has asked this Court to review these claims for plain error. "To be entitled to relief under a plain error standard of review, appellant must show that the trial court's error so substantially affected his rights that a manifest injustice will occur if the error is left uncorrected." *State v. Barriner*, 34 S.W.3d 139, 145 (Mo. banc 2000).

■ Appellant argues that the trial court committed plain error in failing to prohibit the State from making other ref-

3. "An abuse of discretion occurs when the court's order is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Brown v. Kirkham*, 23 S.W.3d 880, 882–83 (Mo.App. W.D.2000). On the record before us, the trial court would also have been acting within its discretion had it seen fit to grant Appellant's requests for a new venire panel or a mistrial. Had the trial court perceived a prejudicial impact on the venire panel resulting from the State's rather clumsy questioning or an inappropriate motive behind those questions, it could certainly have so found and granted the requested relief. The decision was within the trial court's discretion to make, and we must defer to its greater opportunity to observe the attorneys and the venire panel. In such a case, the decision would not have been clearly against the logic of the circumstances or so arbitrary and unreasonable as to shock the sense of justice.

4. In his motion for new trial, Appellant only challenged the trial court's failure to grant a mistrial after the State mentioned the terms of the plea agreement during *voir dire*.

erences to the fact that Wright had agreed to provide "truthful testimony" as part of the plea agreement during the remainder of the trial. Appellant contends that these references along with the State's questions during *voir dire* implied to the jury that the State had verified the accuracy of Wright's testimony through evidence that was not before the jury and thereby violated his right to a fair trial by an impartial jury and his right to due process.

During the direct examination of Wright, the following testimony was elicited:

Q. You were charged with murder in this case. The prosecution offered a plea agreement to you and your attorney, correct?

A. Yes. Yes, they did.

Q. The prosecution offered and recommended to the Court to sentence you to 15 years on one count and 10 years on another count?

A. (Nodded head.)

Q. And what did the prosecution ask in exchange for them to do that? What were you supposed to do?

A. Give my testimony.

Q. Do you remember actually being presented with, you and your attorney, with a three-page letter about your plea agreement?

A. Yeah. She showed me that, uh-huh.

Q. That you signed?

A. I signed it.

Q. Your attorney signed?

A. Yes.

Q. And an assistant prosecutor signed?

A. I know me and my attorney signed it, yeah.

Q. Basically said you agree to cooperate fully and truthfully in this case?

A. That's right.

Q. And have you done that?

A. Yes, I have.

After Appellant used the plea agreement to attack the witness's credibility during cross-examination, during re-direct examination, the following testimony was elicited:

Q. The conditions of your plea agreement were to truthfully testify?

A. Yes.

MR. SMITH: Your Honor, I object to this as there's no relevance—

\* \* \*

Q. The condition of your plea is that you cooperate fully with law enforcement officials; is that correct?

MR. SMITH: I object to the leading nature of the question.

THE COURT: Overruled.

A. Correct.

BY MR. LEVOTA:

Q. The condition of your plea would be your truthful testimony and that you fully cooperate in any investigation involved in the murder of Marlon Mosby?

MR. SMITH: Your Honor, I object to the question as leading.

A. That's correct.

■ The Missouri Supreme Court has previously found similar questioning did not constitute improper vouching in *State v. Wolfe*, 13 S.W.3d 248, 255–56 (Mo. banc 2000). As in *Wolfe*, the State's questioning of Wright related to the terms of his plea agreement and did not imply that the prosecution had additional facts beyond those being presented to the jury. "[A]n immunity agreement not only supports the witness' credibility by showing an interest to testify truthfully, but also impeaches the witness' credibility by showing an interest in testifying favorably for the government, regardless of truth." *Id.* at 256. As with the witness in *Wolfe*, "[b]y the end of

[Wright]'s testimony, the jury could consider [his] credibility in light of the agreement." *Id.*

■ Appellant also challenges comments made by the State during closing argument. In relevant part, the State made the following comments during its argument:

The evidence is to you. We're done. We've given you everything we got. Like Mr. Wimes said, I would love to have brought a choir boy in here to say, "Yeah, I saw him kill him." But that's what we got to deal with. That's what the war on drugs, the drug community. That's the people out there. That's the people that go up and buy drugs, sit in apartments and smoke it, and they go down there. It's the Janice Joneses. It's the David Bruce Smiths. It's the Eric Wrights. And if we can't have them come in and evaluate their testimony and pull out what's true and convict somebody for a brutal murder, we're all wasting our time.

Because you can't believe what the defense attorney wants you to believe, that everything they said was lies, because it's just not true. We know they smoked crack. We know a lot of things they—the first story, they don't want to say anything. They don't want to get involved. But when push comes to shove, they said the same consistent story—

\* \* \*

—for four years. He was there at Janice Jones'. He went there. Remember the details. Remember the details of Eric Wright when he said he watched him bring down Snuffy there, and he was grabbing his—grabbing the railing. He doesn't want to go. He knows he's gonna die. He's pulling him down to the deadly inferno. He's cut up. And you

saw Dr. Young tell you those are defensive wounds. He's fighting for his life. And remember the details of what Eric Wright said. Remember that. Your only decision in this case is whether this defendant is guilty or not guilty, because it's not your decision on how long he serves time. Don't be confused by that. It's not your decision how long he goes away. Your decision is guilty or not guilty.

■ " 'A court should rarely grant relief on assertions of plain error at [closing arguments] because, absent an objection, the trial court's options are limited to an uninvited interference with summation, which increases the risk of error.' " *Dudley*, 51 S.W.3d at 57 (quoting *State v. Stallings*, 957 S.W.2d 383, 392 (Mo.App. W.D.1997)). " '[A]lleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury.' " *State v. Vaughn*, 32 S.W.3d 798, 800 (Mo.App. S.D.2000) (quoting *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc 1988)). " 'Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication.' " *Id.* (quoting *State v. Weicht*, 23 S.W.3d 922, 930 (Mo.App. S.D.2000)).

None of the comments complained of by Appellant in his point relied on were included in this closing argument, and Appellant has failed to explain how any of the comments made during closing argument constituted improper vouching. Furthermore, he has failed to explain how a manifest injustice or miscarriage of justice resulted from the trial court's failure to intervene *sua sponte* in the State's closing argument. Accordingly, on its face, Appellant's claim of plain error related to

the State's closing argument does not merit plain error review.

By lumping all of the aforementioned allegations of error into one point relied on, Appellant was apparently attempting to assert a claim of cumulative plain error related to the State's comments throughout trial. While this court has previously noted that, in some instances, repeated and persistent references to "truthful testimony" could be sufficiently pervasive as to imply to the jury that the accuracy of the witness' testimony has been verified by the State, *Dudley*, 51 S.W.3d at 54, having *ex gratia* considered the overall effect of the comments made by the State, we find that the State's references to the plea agreement were not sufficiently pervasive to warrant a finding of error on the part of the trial court.[5] *See Ringo*, 30 S.W.3d at 822–24; *Wolfe*, 13 S.W.3d at 255–57; *Dudley*, 51 S.W.3d at 53–57. Moreover, "[e]ven if the state's references to the truthful testimony clause in [Wright's] agreement were found to constitute a mild form of vouching, the references were not sufficiently direct and pervasive to shake confidence in the overall fairness of [Appellant's] trial and warrant reversal." *Ringo*, 30 S.W.3d at 823–24. The trial court did not plainly err in allowing the State to make the challenged comments during Appellant's trial. Point denied.

■■■ In his second point, Appellant contends that the trial court plainly erred in granting the State leave to file an amended information after the close of evidence to charge him as a prior offender under § 558.016. Appellant further claims that the trial court plainly erred in finding that he was a prior offender.

■■■ With regard to his claim that the trial court committed plain error in granting the State leave to file an amended information after the close of evidence, we find no error, plain or otherwise. "Rule 23.08 permits the amendment or substitution of an information 'at any time before verdict or finding if no additional or different offense is charged and if a defendant's substantial rights are not thereby prejudiced.'" *State v. Hall*, 956 S.W.2d 427, 430 (Mo.App. E.D.1997). "Repeat offender sentencing provisions do not create an additional substantive offense." *State v. Lawson*, 50 S.W.3d 363, 367 (Mo.App. S.D.2001). Accordingly, the State's amendment of its information or indictment to include a claim that Appellant was a prior offender does not charge the Appellant with an additional or different offense. Likewise, allowing the State to amend its indictment or information to include such allegations cannot be deemed to have prejudiced Appellant's substantive rights. Missouri appellate courts have repeatedly held that allowing such amendment as late as sentencing or even for the first time on remand from appeal does not prejudice a defendant's substantial rights. *See State v. Summers*, 50 S.W.3d 890, 893–94 (Mo.App. S.D.2001). Since the amendments proposed by the State did not charge any additional or different offenses and did not prejudice Appellant's substantive rights, the trial court cannot be deemed to have committed error, plain or otherwise, in allowing the State to file its amended information.

---

5. This is not to say that every reference made to the plea agreement was necessary. To the contrary, had Appellant properly objected to the challenged statements at trial, the trial court might have found the questions and comments inappropriate and exercised its discretion in granting some form of relief. And had the references been even more abundant, they would certainly have approached the level of pervasiveness that Missouri's appellate courts have condemned.

■ Having found that the trial court did not err in allowing the State to amend its information to include an allegation that Appellant was a prior offender, we must next address Appellant's contention that the trial court erred in finding that he was a prior offender. Under § 558.016.2, "[a] 'prior offender' is one who has pleaded guilty to or has been found guilty of one felony." The pleas or findings of guilt used to establish prior offender status must have occurred "prior to the date of commission of the present offense." *§ 558.016.6.*

■ Section 558.021.1 sets forth the procedural requirements to sentence a defendant as a prior offender. *State v. Merrill,* 990 S.W.2d 166, 172 (Mo.App. W.D. 1999). Pursuant to that section, the information or indictment must plead all the essential facts warranting a finding that the defendant is a prior offender. *§ 558.021.1(1).* In addition, evidence must be introduced sufficiently establishing the facts pleaded to warrant finding beyond a reasonable doubt that the defendant was a prior offender. *§ 558.021.1(2).* Finally, the trial court must make findings of fact sufficient to support finding beyond a reasonable doubt that the defendant is a prior offender. *§ 558.021.1(3).*

Appellant argues that the trial court erred in finding he was prior offender because, in its amended pleading, the State based its assertion of prior offender status on a 1999 manslaughter conviction and because the trial court expressly relied upon that conviction in making its finding of prior offender status. Appellant points out that this conviction occurred subsequent to Moseby's murder and cannot be used to establish his prior offender status in this case under the applicable statutory language. Appellant is correct in this regard.

The State's pleadings claiming that Appellant was convicted of felony manslaughter subsequent to the date of Moseby's murder are insufficient to satisfy the requirements of § 558.016.6 that the prior convictions have occurred before the offense for which Appellant was on trial. *State v. McFall,* 866 S.W.2d 915, 918 (Mo. App. S.D.1993). Likewise, the trial court's finding that Appellant was convicted of manslaughter subsequent to the date of Moseby's murder is insufficient to support a finding of prior offender status in this case. *State v. Vaught,* 34 S.W.3d 293, 296 (Mo.App. W.D.2000).

In response, the State contends that these errors are harmless because it also introduced records related to a 1988 robbery conviction into evidence. However, the admission of that evidence does not cure the deficiencies in the State's information or the trial court's factual findings, both of which relied solely on the 1999 manslaughter conviction. The requirements of § 558.021.1(1) and (3) simply were not met in this case. The trial court erred in finding that the State had sufficiently pled that Appellant was a prior offender in its amended information and in finding that Appellant was a prior offender based upon the 1999 manslaughter conviction. Such error constitutes manifest injustice warranting relief under the plain error rule. *Id.*

Based upon this error, we reverse the trial court's imposition of sentence and remand for re-sentencing. On remand, the State may amend the information and present evidence that Appellant was convicted of at least one felony prior to August 26, 1996. *See Id.* If the State fails to plead and prove that Appellant was convicted of at least one felony prior to August 26, 1996, "the circuit court should

grant a new trial and submit the issue of punishment to the jury." *Id.*

All concur.